**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| HAROLD MALCOLM SINGFIELD,<br><br>Petitioner,<br><br>v.<br><br>WARDEN,<br><br>Respondent. | Civil Action No. 23-2052-TDC |

# MEMORANDUM OPINION

Petitioner Harold Malcolm Singfield, a self-represented inmate at the North Branch Correctional Institution in Cumberland, Maryland ("NBCI"), has filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in which he collaterally attacks his 2017 conviction in the Circuit Court for Washington County, Maryland on multiple counts related to armed robberies at four convenience stores. The Petition is fully briefed. Upon review of the submitted materials, the Court finds that no hearing is necessary. *See* Rule 8(a), Rules Governing Section 2254 Cases in the United States District Courts; D. Md. Local R. 105.6. For the reasons set forth below, the Petition will be DENIED.

## BACKGROUND

### I. Conviction and Sentence

On November 19, 2014, a grand jury in the Circuit Court for Washington County ("the Circuit Court") returned an 86-count indictment against Singfield relating to armed robberies of four convenience stores that occurred on August 28, 2024; September 1, 2014; September 17, 2014; and September 28, 2014. On July 23, 2015, following a three-day jury trial ("the first trial"),

Singfield was convicted on 42 counts. On August 18, 2015, the Circuit Court sentenced Singfield to a total of 68 years of imprisonment.

On direct appeal, the Appellate Court of Maryland ("the Appellate Court") reversed on the grounds that the trial court erred in its analysis of Singfield's Motion to Sever seeking separate trials relating to each of the four robberies. The Appellate Court found that the Circuit Court was required by Maryland law "to find from the hearing record that the evidence relating to each of the four robberies was mutually admissible vis-à-vis the others." State Record ("S.R.") 130, ECF No. 5-1.

On remand, Singfield waived his right to a jury trial, so the Circuit Court conducted a bench trial in December 2017 ("the second trial"). The evidence showed that four armed robberies occurred at the following convenience stores on the following dates in 2014: the High's Dairy Store in Smithsburg, Maryland on August 28, 2014; the Sheetz gas station and convenience store on Virginia Avenue in Hagerstown, Maryland on September 1, 2014; the Sheetz on Eastern Boulevard in Hagerstown on September 17, 2014; and the Sheetz at Huyetts Crossroads in Hagerstown on September 24, 2014.

**A. High's Dairy Store**

Kellie Godsey, a High's Dairy Store employee, testified that on August 28, 2014, a white man with tattoos who was wearing a white t-shirt came into the store and purchased $5 of gasoline. While he was in the store, the tattooed man was using a cell phone and said, "the party is good," 12/13/17 Trial Tr. at 1-46, ECF No. 5-6, before he exited the store and went to pump the gas. Godsey further testified that a black man wearing a bandana and carrying a gun came into the store and demanded money. Godsey opened the register and gave him money. Barbara Mays, another High's Dairy Store employee, also testified that a black man wearing a red bandana came into the

store to rob it, and Godsey gave him money from the register, which amounted to approximately $140.

Senior Trooper James Bowers of the Maryland State Police investigated the robbery. He testified that Robert Hackett was identified as the white man with tattoos who entered the store prior to the robbery.

**B. Sheetz on Virginia Avenue**

On September 1, 2014, Tawnya Shearer, Dorothy Diebert, and Krystle Hood were working at the Sheetz on Virginia Avenue ("the Viriginia Avenue Sheetz"). Shearer, the overnight shift supervisor, testified that two black men wearing bandanas came in and demanded money from the register. The man wearing a red bandana was carrying a gun. Shearer opened the register, took out money, and handed it to them. Diebert also testified that two black men entered the store wearing bandanas, one with a gun, and that when they demanded money, Shearer opened the register and handed over the money. Hood testified that she was being trained to make frozen drinks when she saw two black men wearing bandanas enter the store, one of which was red. Hood testified that one man showed a gun and said, "[G]ive me all your money." *Id.* at 1-86. She stood by as the other employees moved to the registers to provide the money. At one point, the gunman pointed the gun at her and asked why she was not moving, to which she responded that she did not have access to the registers. A surveillance video depicting the robbery was retrieved and presented at trial.

**C. Sheetz on Eastern Boulevard**

On September 17, 2014, Jami Embrey was the store manager at the Sheetz on Eastern Boulevard ("the Eastern Boulevard Sheetz"). Embrey testified that during the overnight shift, she was working in the deli area in the back when a black man wearing a bandana across his face and

carrying a gun came through the swinging door and demanded money. Embrey testified that she told the man that she was the manager, she gave him between $400 and $500, and he left. While she was getting the money out of the register, he repeatedly gave warnings such as "30 seconds until I have to shoot someone" and "10 seconds until I have to shoot someone." *Id.* at 1-110.

Brian Fields was a customer at the Eastern Boulevard Sheetz that night. Fields testified that he saw a black man wearing a black bandana and carrying a revolver come in, point the gun at employees, and ask for money. The store employees gave money to the robber, and he left.

Another employee, Carolyn Sweeney testified that prior to the robbery, she noticed a woman walking around the store aimlessly, then heard her talking to a man on a cellphone while she was in the bathroom. When the woman emerged from the bathroom, she asked about the costs of blunts while repeatedly looking over her shoulder, then said she was going to her car to get more money.

Detective Jesse Duffey of the Hagerstown Police Department investigated the robbery. He testified that a red Dodge Avenger was seen on a Sheetz surveillance video before the robbery, and that based on the license plate, law enforcement identified the registered owner of that vehicle.

**D. Sheetz at Huyetts Crossroads**

On September 24, 2014, Kelly Kuhn was buying lunch at the Sheetz at Huyetts Crossroads ("the Huyetts Crossroads Sheetz"). Kuhn testified that as she was paying, she felt something hard and metal pressing into her rib cage, and she heard someone tell the cashier to hand over all the money. Kuhn testified that the employee handed over the money, and the man left. Kuhn noticed that the man was black and wearing a bandana on his face.

Wayne Bishop, another customer, testified that he was inside the Sheetz that morning, in line to pick up food, when a black man with a mask came up and pinned a woman against the

counter. Bishop testified that the man reached into his right pocket and pulled out a gun that he showed to Bishop. Bishop further testified that there was a second masked black man standing behind him pressing a gun into his back. The manager went to the register, complied with the demands to hand over money, and the two robbers left in a red compact car.

**E. The Investigation**

Tracie Clevenger, a Sheetz investigator, testified that approximately $700 was stolen from the Virgina Avenue Sheetz, $400 was stolen from the Eastern Boulevard Sheetz, and $500 was stolen from the Huyetts Crossroads Sheetz.

Detective Duffey testified that law enforcement came to believe that the robberies were related. Specifically, he testified that the red Dodge Avenger that was seen on the surveillance video from the Eastern Boulevard Sheetz robbery was also believed to be involved in the Huyetts Crossroads Sheetz robbery. A GPS tracker was placed on that vehicle from September 26, 2014 through October 6, 2014. With the aid of that device, Detective Duffey followed the vehicle on September 30, 2014 and as a result of the surveillance observed that Robert Hackett, who was identified as a suspect in the High's Dairy Store robbery, entered a Sheetz on East Washington Street with Harold Singfield. Detective Duffey recounted that Singfield was arrested on October 7, 2014, was given *Miranda* warnings, and gave a statement in which he admitted that he knew Hackett but denied that he was involved in any of the robberies.

Sergeant Jared Barnhart of the Washington County Sheriff's Office testified that photographs of a red Dodge Avenger were seen on Singfield's Facebook page. He further testified that the surveillance video from the Eastern Boulevard Sheetz showed a white woman leaving the area in a red Dodge Avenger. He also testified that surveillance videos showed that the same green

GMC Jimmy was at both the High's Dairy Store robbery and the Virginia Avenue Sheetz robbery. Sergeant Barnhart determined that a 1999 green GMC Jimmy was registered to Hackett's mother.

After search warrants were obtained for Singfield's Facebook and cell phone records, a review of the cell phone records by Sergeant Barnhart revealed over 700 phone calls between Singfield's number and a number identified as belonging to Hackett. After Hackett's cell phone records were obtained, Sergeant Barnhart used cell phone tower information from the times of each of the four robberies and determined that during the High's Dairy Store robbery, the cell phones of both Singfield and Hackett accessed the same cell tower near that store. During the Virginia Avenue Sheetz robbery, Hackett's phone made a call within the service range of the cell tower near that store. Around the same time, a call made from Singfield's cell phone accessed the same cell tower and transferred to another. During the Eastern Boulevard Sheetz robbery, Singfield's cell phone made a long call to Hackett's cell phone that accessed the tower within the service range of the store. At that time, Hackett's cell phone was confirmed to have accessed that same cell tower at the start and end of the call. Finally, during the Huyetts Crossroads Sheetz robbery, the cell phones of Singfield and Hackett both accessed the same cell tower located some distance away from the store.

Sergeant Barnhart testified that the woman who was using a cell phone in the Huyetts Crossroads Sheet shortly before the September 17, 2014 robbery was identified using the phone records, surveillance video, and Facebook photos as Erica Licata, and a photo from Singfield's Facebook page that depicted Singfield, Hackett, and Licata was introduced into evidence. The prosecution called Licata as a witness. She admitted that she knew Hackett but stated that she did not recall being on the phone with anyone on September 17, 2014 while at a Sheetz store. The prosecution impeached Licata with her prior statement to the police, in which she stated that she

was on the phone with Singfield when she went into the Sheetz on September 17, 2014, and that, during the call, Singfield asked her how many people were in the store. Nevertheless, after she was confronted with her prior statement, Licata repeated her testimony that she did not recall being on the phone with Singfield at the Sheetz.

Donna Claiborne testified on behalf of the defense. Claiborne testified that she knew Singfield from work, and that Singfield came to her residence on September 17, 2014 at 2:30 a.m. because he needed a place to stay. Claiborne further testified that they left to get cigarettes at a Sheetz on Washington Street, were there for about 10 minutes, and then went back to the house. The prosecution impeached Claiborne using her prior statement to the police, in which she had stated that she last saw Singfield that night at 1:00 a.m. but denied that he told her that he had committed a robbery.

On behalf of the defense, Robert Hackett testified that he was convicted of the armed robberies of the High's Dairy Store and Virginia Avenue Sheetz. Hackett testified that he considers Singfield to be like family, and that to his knowledge Singfield was not involved in the robberies of which he was convicted. When defense counsel asked Hackett specifically whether Singfield was involved in any of the robberies in which Hackett was charged, Hackett invoked his Fifth Amendment right against self-incrimination, and because he was represented by counsel for post-conviction proceedings, the trial judge curtailed the remainder of his testimony.

Finally, Singfield testified in his own defense. Singfield testified that during the High's Dairy Store robbery on August 28, 2014, he was drunk and passed out at home. He asserted that as of that date, he had given his cell phone to his neighbors, Calvin Bell and Brittany Graham. Singfield also testified that his car appeared in surveillance video of multiple robberies because he often lends it to others.

Singfield further testified that during the Virginia Avenue Sheetz robbery on September 1, 2014, he was in Baltimore with family; during the Eastern Boulevard Sheetz robbery on September 17, 2014, he was with Donna Claiborne; and during the Huyetts Crossroads Sheetz robbery on September 24, 2014, he was with a friend in the neighborhood and had gone to the Sheetz to use the bathroom. Singfield stated that while at the Huyetts Crossroads Sheetz, he saw two individuals named "Lamar" and "Jay" Eaddy suspiciously exit a Cadillac. 12/15/17 Trial Tr. at 3-89, ECF No. 5-8. He claimed that Eaddy later told Singfield that he committed the High's Dairy Store robbery.

On December 18, 2017, the trial judge found Singfield guilty on 31 counts. Although Singfield had been acquitted by the jury on Count 21, which charged Singfield with an armed robbery of Krystle Hood at the Virginia Avenue Sheetz on September 1, 2014, the trial judge found him guilty of Count 21 after the second trial. On January 11, 2018, the trial court again sentenced Singfield to a total term of imprisonment of 68 years.

## II. Direct Appeal

Following the second trial, Singfield filed a direct appeal to the Appellate Court and asserted two assignments of error: (1) the trial court abused its discretion in denying Singfield's Motion to Sever; and (2) the trial court erred in refusing to consider a Motion to Suppress asserted by Singfield after the remand for a new trial. On September 25, 2019, the Appellate Court affirmed Singfield's conviction and sentence through a written opinion. Singfield's subsequent petition for a writ of certiorari to the Supreme Court of Maryland ("the Maryland Supreme Court") was denied on January 24, 2020.

## III. Post-Conviction Proceedings

On April 27, 2022, Singfield, through counsel, filed with the Circuit Court a Petition for Post-Conviction Relief ("the State Petition") pursuant to the Maryland Uniform Postconviction Procedure Act, Md. Code Ann., Crim. Proc. §§ 7–101 to 7–109 (West 2025). The State Petition asserted the following claims:

1. Singfield was tried and convicted of counts related to Krystle Hood in violation of his rights under the Double Jeopardy Clause of the Fifth Amendment.

2. The prosecutor engaged in prosecutorial misconduct that denied Singfield a fair trial, and trial counsel was ineffective for failing to object or request a mistrial.

3. Trial counsel was ineffective for asking defense witness Donna Claiborne whether she was aware that Singfield had been previously convicted of second-degree murder in order to "take out the sting" and as a defense tactic.

4. Trial counsel was ineffective for failing to properly argue the need for a second suppression hearing.

5. Trial counsel was ineffective for failing to properly investigate and interview witnesses Singfield provided to counsel.

6. The cumulative effect of the errors denied Singfield his constitutional right to the effective assistance of counsel as well as the right to a fair trial.

S.R. 361, 364–65, 370, 375, 377, 380.

The Circuit Court held a hearing on the State Petition on October 17, 2022 ("the post-conviction hearing") and issued a Statement of Reasons and Order on November 1, 2022. The Circuit Court agreed that Singfield's right to be free from double jeopardy was violated when he was convicted at the second trial of the armed robbery of Krystle Hood and vacated the conviction and sentence on that count but otherwise denied the State Petition. Also on November 1, 2022, the Circuit Court issued an amended commitment order reflecting Singfield's new overall sentence. On December 2, 2022, Singfield's counsel filed a Motion to Reissue the Order in which

she asserted that she had never received a copy of the Order. The Circuit Court granted the motion on December 29, 2022.

On January 23, 2023, Singfield, through counsel, filed an Application for Leave to Appeal the denial of the State Petition. The Application advanced two issues for appeal:

1. The prosecutor engaged in prosecutorial misconduct that denied Mr. Singfield a fair trial, and trial counsel was ineffective for failing to object or request a mistrial.

2. Trial counsel was ineffective for asking defense witness Donna Claiborne whether she was aware that Mr. Singfield had been previously convicted of second-degree murder in order to "take out the sting" and as a defense tactic.

S.R. 397, 403. On May 24, 2023, the Appellate Court summarily denied Singfield's Application. The mandate issued on June 29, 2023.

## IV. Petition for a Writ of Actual Innocence

On June 27, 2023, Singfield filed a Petition for a Writ of Actual Innocence ("the State Innocence Petition") with the Circuit Court in which he alleged that he had recently discovered another individual, Michael Jobes, who confessed to the crimes for which Singfield was convicted and attached an affidavit from Jobes ("the Jobes Affidavit"), in which Jobes purportedly claims responsibility for two of the four robberies. Singfield also asserted that the State's Attorney's Office was aware of this information, withheld it from him, and failed to disclose it to the Circuit Court. The State opposed the petition on the grounds that the first time the prosecution ever saw the Jobes Affidavit was in 2021, when Singfield attached it to a Motion for Review of the Sentence by a three-judge panel. The State challenged the reliability of the Jobes Affidavit, in part because at trial, Singfield had accused a different third party of committing the robberies. Although the Circuit Court scheduled a hearing on the Petition to occur on January 7, 2026, it summarily dismissed the petition before the hearing date, on September 26, 2025, as lacking merit.

## V. Federal Petition

On July 14, 2023, Singfield filed with this Court his Petition for a Writ of Habeas Corpus. He asserts five claims: (1) the prosecutor engaged in prosecutorial misconduct that denied Singfield a fair trial and sentencing; (2) Singfield was tried and convicted of Count 21, alleging the armed robbery of Krystle Hood, in violation of his constitutional right to be free from double jeopardy; (3) his trial counsel was ineffective as a result of asking witness Donna Claiborne, as a "defense tactic," whether she was aware that Singfield had been previously convicted of second-degree murder; (4) his trial counsel was ineffective for failing properly to investigate and interview witnesses identified by Singfield; and (5) the trial judge violated his constitutional rights by denying a suppression hearing prior to the retrial, and trial counsel was ineffective for failing properly to argue the need for the second suppression hearing. ("Claims 1–5"). Supp. Pet. at 2, ECF No. 1-1.

On October 12, 2023, Respondents filed a Limited Answer in which they argued that the Petition is untimely. In his Reply to the Limited Answer, Singfield argued that the Petition should be considered because he has a credible claim of actual innocence based on the Jobes Affidavit. In a Supplement to his Reply, Singfield also argued that the Petition is timely because the limitations period did not begin to run until the date of his resentencing after the resolution of the State Petition. In this same filing, Singfield appears to seek to add three additional claims to the Petition, which the Court construes as the assertion of a Motion to Amend the Petition.

In light of Singfield's arguments, the Court ordered Respondents to file an additional Answer to address the impact of the resentencing on the timeliness argument, the merits of Singfield's claims, and Singfield's actual innocence claim, as well as to supplement the record with additional documents necessary to adjudicate the Petition. In a Supplemental Answer,

Respondents address these issues and also assert that several of Singfield's claims are procedurally defaulted.

## DISCUSSION

### I. Motion to Amend the Petition

In his Supplement to the Reply, filed on June 28, 2024, Singfield seeks to add three additional claims to his habeas petition:

> 1. Actual Innocence. Affidavit has just been discovered of an individual confessing to the crimes that Petitioner is currently serving time for. It is an undisputed fact that the affidavit is genuine and proves the innocence of the Petitioner.
>
> 2. Prosecutorial Misconduct. Prosecutors withheld a confession from the court that would prove their theory wrong and would exonerate the Petitioner from all of the crimes that he is currently serving time for. Withholding exculpatory evidence.
>
> 3. Ineffective Assistance of Counsel. It has just been recently discovered that counsel Nancy Forster was representing a witness in this case at the same time that they were representing Petitioner at his post-conviction hearing. Conflict of interest.

Supp. Reply at 2, ECF No. 10.

The Court will construe this part of the Supplement to the Reply as a Motion to Amend the Petition pursuant to Federal Rule of Civil Procedure 15. *See* 28 U.S.C. § 2242 (providing that a habeas petition "may be amended or supplemented as provided in the rules of procedure applicable to civil actions"). Although leave to amend should be freely given by this Court, it may be denied where the proposed amendment "would be prejudicial to the opposing party, the moving party has acted in bad faith, or the amendment would be futile." *See Equal Rights Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 603 (4th Cir. 2010).

Here, the Court will not permit the requested amendments because the additional claims would be futile. The first and third proposed new claims are non-cognizable on federal habeas

review. *See Teleguz v. Pearson*, 689 F.3d 322, 327–28 (4th Cir. 2012) (stating that "actual innocence … is a procedural mechanism rather than a substantive claim" and that an "innocence claim does not by itself provide a basis for relief"); 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254").

Singfield's second proposed new claim is also futile because it fails to state a viable claim for relief. This claim is fairly construed as a due process claimed based on a failure to disclose exculpatory evidence pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), specifically, that the State improperly withheld the Jobes Affidavit from Singfield. Proof that the State had possession or control over the allegedly exculpatory evidence is a necessary element of a *Brady* claim. *See United States v. Stokes*, 261 F.3d 496, 502 (4th Cir. 2001). Singfield cannot establish this requirement because the Jobes Affidavit, on its face, is dated October 4, 2018, which is almost a year after the second trial concluded on December 18, 2017 and also after he was sentenced on January 11, 2018. Notably, "the Supreme Court has made clear that *Brady* only protects a defendant '*before trial*' and that 'nothing in its precedents suggests that *Brady*'s disclosure obligation continues after the defendant is convicted and the case is closed.'" *Watkins v. Rubenstein*, 802 F.3d 637, 642 (4th Cir. 2015) (quoting *Dist. Att'y's Off. for the Third Jud. Dist. v. Osborne,* 557 U.S. 52, 68–69 (2009). Accordingly, the Motion to Amend the Petition will be denied, and the Court will proceed to review the five claims included in Singfield's original Petition.

**II. Motion to Stay**

On September 4, 2026, Singfield filed a Motion to Request a Continuance or a Stay and Abeyance" ("the Motion to Stay"), ECF No. 21, in which he requests a stay of the federal

proceedings so that he may return to state court to exhaust the claims in which Respondents assert the defense of procedural default or to advance other claims arising from alleged improprieties with the state court proceedings relating to the State Innocence Petition. However, Singfield has since submitted an additional filing in which he seeks to withdraw this Motion. ECF No. 23. Thus, the Court will consider the Motion to Stay to be withdrawn, and it will be dismissed as moot.

## III. Procedural Arguments

Respondents argue that, where Singfield's judgment became final in January 2020 after the Appellate Court affirmed his conviction and sentence and his petition for a writ of certiorari to the Maryland Supreme Court was denied, the Petition is time-barred based on the one-year limitations period applicable to federal habeas petitions in non-capital cases filed by a person convicted in state court. 28 U.S.C. § 2244(d). Singfield argues that the Petition is timely as a result of the issuance of a new commitment order with a revised sentence on November 1, 2022. The Court need not and will not address this issue because, as discussed below, the Petition is most efficiently resolved on the merits. *See Day v. McDonough*, 547 U.S. 198, 208 (2006) (finding that because the statute of limitations is not jurisdictional, a district court has discretion to decide whether the administration of justice is better served by addressing the statute of limitations or reaching the merits of a petition); *Trussell v. Bowersox*, 447 F.3d 588, 590 (8th Cir. 2006) (finding that because the statute of limitations is not a jurisdictional bar to federal habeas review, the court would, "in the interest of judicial economy, proceed to the merits" of the petition).

Respondents also argue that several of Singfield's claims should be dismissed pursuant to the doctrine of procedural default. Upon consideration of the arguments for and against procedural default, which require consideration of complicated legal and factual issues arising from Singfield's assertion that any procedural default should be excused based on his claim of actual

innocence, the Court need not and does not resolve those arguments, because it finds that judicial efficiency is better served by addressing and resolving Singfield's claims on the merits. *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (finding that a court may bypass procedural bar analysis and address claims on the merits if the procedural bar issue "involved complicated issues of state law" and the claim is "easily resolvable against the habeas petitioner"); *Trussell*, 447 F.3d at 590 (finding that because procedural default is not a jurisdictional bar to federal habeas review, the court would, "in the interest of judicial economy, proceed to the merits" of the petition).

## IV. Legal Standard

A federal petition for a writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). The federal habeas statute sets forth a highly deferential standard for evaluating state court rulings, under which state court decisions are to "be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005); *see Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997). A federal court may not grant a writ of habeas corpus unless the state court's adjudication on the merits (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). A state court adjudication is contrary to clearly established federal law under § 2254(d) when the state court (1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law"; or (2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" that of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal

principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

"[A] federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Williams*, 529 U.S. at 411). The state court's application of federal law must be "objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409). Furthermore, under § 2254(d)(2), "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010) (citation omitted). The fact that "reasonable minds reviewing the record might disagree about the finding in question" is not enough to deem a state court's factual determination unreasonable. *Id.* (quoting *Rice v. Collins*, 546 U.S. 333, 341–42 (2006)).

**V. Prosecutorial Misconduct**

In Claim 1, Singfield asserts that the prosecutor engaged in misconduct through (a) alleged witness intimidation, (b) withholding of impeachment evidence, and (c) improper statements at the sentencing hearing. Part (a) was asserted in Singfield's State Petition.

On a habeas petition, a claim of prosecutorial misconduct is reviewed to determine whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). The standard of review for prosecutorial misconduct in federal habeas cases is "the narrow one of due process, and not the broad exercise of supervisory power" that a court ordinarily has over the proceedings. *Id.* at 642.

**A. Witness Intimidation**

First, Singfield argues that the prosecutor engaged in misconduct because he told Donna Claiborne, prior to her testimony in the second trial, that Singfield had a prior conviction for second-degree murder. During questioning by defense counsel at the second trial, Claiborne testified as follows:

> Q. And are you aware that Mr. Singfield has a, uh, prior conviction for second degree murder?
>
> A. Um, I wasn't aware of that until—when I came in on Wednesday when they had everybody come into the back of the room, all the witnesses. The State has me scared now to testify because they said he was [a] convicted murderer. I never knew that until then.
>
> Q. When was this?
>
> A. On Wednesday when the State had everybody come in, all the witnesses come into the back of the room before trial began, um, he was talking about Harold Singfield having a prior conviction and I never knew that before.

12/15/17 Trial Tr. at 3-32.

Singfield's trial counsel, however, testified at the state post-conviction hearing that Claiborne was both a potential State's witness and defense witness, that she was told about Singfield's prior conviction through a general statement made to all of the State's witnesses, that Claiborne testified "as well as I thought she could testify," and that he did not believe that the prosecutor's statement affected her testimony. Post-Conviction Hrg. Tr. at 26–28, ECF No. 20-9.

In denying the State Petition on this issue, the Circuit Court noted that the State had asserted that the statement about Singfield's prior conviction had been made to all of the State's witnesses to explain why it was necessary to have them testify in a second trial. The Circuit Court found no prosecutorial misconduct and concluded that there was no evidence that Claiborne's testimony had changed because of the allegedly improper statement. In light of trial counsel's testimony, and

where the second trial was a bench trial so there was no argument that the fact of Singfield's prior conviction could have tainted the jury, the Court does not find that the prosecutor's statement violated Singfield's due process rights and concludes that the Circuit Court's rejection of part (a) of the prosecutorial misconduct argument was neither contrary to nor an unreasonable application of federal law.

## B. Impeachment Evidence

In part (b) of the prosecutorial misconduct argument, Singfield argues that the prosecutor engaged in misconduct by failing to disclose to the defense favorable fingerprint evidence, a "CVSA" ("certified voice stress analysis") test taken by Claiborne, and information about the mental health of another witness, Erica Licata. Supp. Pet. at 3–4.

Under *Brady v. Maryland*, 373 U.S. 83 (1964), "the suppression by the prosecution of evidence favorable to an accused" violates due process where the evidence is "material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. Thus, in order to establish prosecutorial misconduct based on a *Brady* violation, the withheld evidence must be (1) favorable to the accused, "either because it is exculpatory, or because it is impeaching"; (2) suppressed by the prosecution, "either willfully or inadvertently"; and (3) material in that "prejudice must have ensued" from the failure to disclose. *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *see United States v. Bagley*, 473 U.S. 667, 676 (1985) (holding that *Brady* applies to impeachment evidence).

In response to Singfield's State Innocence Petition, the State provided proof that it had disclosed both the fingerprint evidence and the CVSA test in pretrial discovery. S.R. II 288–89, ECF No. 20-1. Indeed, trial counsel acknowledged that he was aware of the fingerprint evidence prior to trial by referencing it during a pretrial argument on Singfield's Motion to Sever. 12/13/17

Mot. Hrg. Tr. at 1-5, ECF No. 5-6. Thus, there was no *Brady* violation based on either of these two items of evidence.

As for the evidence relating to Licata's mental health, Licata was an uncooperative witness for the State who was granted immunity to prevent her from asserting her Fifth Amendment right against self-incrimination, and her testimony largely consisted of verifying that she was the subject of a recorded interview, played at trial, in which she stated that she drove with Singfield to a Sheetz and went into the store at his request. The record reflects that the defense was aware of and elicited information that Licata had mental health issues. *See Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 557 (4th Cir. 1999) ("Suppressed evidence is 'information which had been known to the prosecution but unknown to the defense.'"). At the very outset of cross examination, trial counsel asked Licata if she had been diagnosed with any mental health issues that would affect her ability to "perceive reality." 12/14/17 Trial Tr. at 2-226, ECF No. 5-7. Licata responded that she had been diagnosed with "psychosis of mental disorders since 2012," that when not medicated she "sees things" and "hears things" that may not be the truth, and that she used acid and crystal meth daily. *Id.* at 2-227. Singfield has not identified any additional facts about Licata's mental health that were withheld from his trial counsel, that were not elicited on cross examination, and that would have altered the known facts about Licata's mental health in a way material to outcome of the trial. Under these circumstances, and where the record reflects that the defense firmly established on cross examination that Licata had significant mental health issues that could affect her ability to perceive events, the Court finds no due process violation relating to this or any of the other allegedly withheld impeachment evidence.

### C. Sentencing Hearing Statements

In part (c) of the prosecutorial misconduct claim, Singfield argues that the prosecutor made improper statements at his sentencing hearing. Specifically, Singfield asserts that the prosecutor should have refrained from referencing any crimes he allegedly committed that did not result in a conviction, offering the uncorroborated claim that the robberies were motivated by a drug enterprise, and commenting on his juvenile record.

At the sentencing hearing following the first trial, on August 18, 2015, the State recommended a sentence of 100 years, but the trial court imposed an aggregate sentence of 68 years of imprisonment, which generally consisted of 17 years for each of the four armed robberies—12 years for armed robbery and an additional 5 years for carrying a handgun in relation to the armed robbery.

After the second trial, Singfield was resentenced on January 11, 2018. The prosecutor acknowledged that under Maryland law, on a resentencing following a remand from the Appellate Court and a new trial, the sentence can be increased above the original sentence only if there are specific reasons for the higher sentence, Md. Code Ann., Cts. & Jud. Proc. § 12-702(b), and under *Twigg v. State*, 133 A.3d 1125 (Md. 2016), "a defendant's sentence will be considered to have increased under § 12–702(b) only if the total sentence imposed after retrial or on remand is greater than the originally imposed sentence." *Id.* at 1141. The prosecutor therefore argued that the trial court could restructure Singfield's sentence but could not impose a total sentence of more than 68 years of imprisonment.

In arguing for that sentence, the prosecutor discussed Singfield's personal history, including that he had been under state supervision most of his life and had an "extensive juvenile history." 1/11/18 Sentencing Hrg. Tr. at 15, ECF No. 5-10. He referenced Singfield's prior history

of a homicide conviction and also referenced an incident in which Singfield impregnated a 14-year-old girl, as apparently admitted to by Singfield or his father in the presentence investigation report, and noted that such uncharged conduct constitutes a criminal offense under Maryland law. He also argued that, based on the broader investigation of co-conspirators, the motive for the robberies appeared to be to fund a drug enterprise, but he noted that Singfield had not admitted to that motivation. During his mitigation argument, trial counsel also referenced Singfield's juvenile history and acknowledged that he had been arrested for a drug offense when he was 12 years old.

The trial court imposed a sentence of 68 years of imprisonment, again amounting to consecutive 17-year sentences for each of the four armed robberies. In providing the reasons for the sentence, the trial court stated:

> The Court is going to do the following – these are crimes of violence. They're crimes of violence that terrified many innocent victims. The people that worked at the High's and the Sheetz stores, uh, that were violated in this case had no business be violated in that way.
>
> * * *
>
> [I]n this case, we have a defendant who poses a clear and present danger to the public when he is among it. To the extent the Court can prevent further instance of this type of event committed by Mr. Singfield or worse, the Court feels [an] obligation to do so.

*Id.* at 29, 33–34.

On this record, Singfield has failed to demonstrate how the prosecutor's statements violated his due process rights. He has not shown how the referenced statements were improper at a sentencing hearing, at which the trial court may consider the nature and circumstances of the offense and a defendant's entire personal history. More specifically, there is no basis to conclude that the statements about juvenile history, uncharged conduct, and the drug-related nature of the crimes had any impact on the sentence. First, the sentence imposed was the same overall sentence

imposed after the first trial, prior to the allegedly improper statements made by the prosecutor after the sentencing hearing after the second trial. Second, the trial judge's stated reasons for the sentence focused on the violent nature of the crimes, the impact on the victims, and the need to prevent Singfield from committing a similar crime again; the trial judge made no mention of any of the prosecutor's statements underlying Singfield's present argument and did not reference the issues underlying those statements. Accordingly, the Court finds that Singfield has failed to establish that he is entitled to habeas relief on this or any of the other parts of his prosecutorial misconduct claim.

## VI. Double Jeopardy

In Claim 2, Singfield asserts that he is entitled to a new trial because Count 21, which charged him with armed robbery of Krystle Hood and was declared illegal on double jeopardy grounds, "taint[ed] the entire trial." Supp. Pet. at 6–7.

At the first trial, the jury acquitted Singfield of Count 21. At the second trial, however, the trial judge found Singfield guilty on Count 21 and imposed a 12-year sentence on that count, to run concurrently to the sentence on Count 20. In the State Petition, Singfield successfully argued that the conviction on Count 21 at the second trial violated the Double Jeopardy Clause of the Fifth Amendment to the Constitution, and the conviction and sentence on that count were vacated.

In addressing whether "a conviction for an unbarred offense is inherently tainted if tried with a jeopardy-barred charge," the Supreme Court has held that a "new trial is required only when the defendant shows a reliable inference of prejudice." *Morris v. Mathews*, 475 U.S. 237, 246 (1986). The defendant has the burden "to demonstrate a reasonable probability that he would not have been convicted of the nonjeopardy-barred offense absent the presence of the jeopardy-barred offense." *Id.* at 247. Singfield has not done so.

At the second trial, Singfield was convicted of 31 counts, only one of which was jeopardy-barred. As discussed above, the trial judge heard three days of testimony from 21 witnesses about the four different armed robberies. Count 21 alleged an armed robbery of Krystle Hood at the Virginia Avenue Sheetz. There were 13 other properly charged counts relating to that armed robbery, including charges of the armed robbery of Tawnya Shearer and conspiracy to commit armed robbery, so the testimony of the three witnesses who testified about that robbery, including that of Hood, was correctly admitted in relation to those properly charged counts. Likewise, the video surveillance evidence introduced in relation to that armed robbery was properly admitted in relation to the other counts. Thus, Singfield has not shown that any evidence was improperly admitted in relation to Count 21 only.

Most importantly, where the second trial was a bench trial, the Court finds no reasonable probability that the fact that Count 21 was charged and a subject of the trial tainted the trial judge's ability accurately to determine Singfield's guilt on the remaining counts. The Petition will therefore be denied as to the argument relating to Count 21.

## VII. Ineffective Assistance of Counsel

In Claims 3 and 4, Singfield asserts that his trial counsel provided ineffective assistance by revealing his prior conviction for second-degree murder and failing to investigate his alibi witnesses.

The Sixth Amendment to the United States Constitution guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. Const. amend. VI. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court held that to prevail on a claim of ineffective assistance of counsel, a petitioner must establish two prongs: deficient performance and prejudice. *Id.* at 692.

First, the petitioner must show that counsel's performance was deficient in that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Deficiency exists when "counsel's representation fell below an objective standard of reasonableness" under "prevailing professional norms." *Id.* at 688; *see Wiggins v. Smith*, 539 U.S. 510, 521 (2003). "Judicial scrutiny of counsel's performance must be highly deferential" and apply "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*

Second, the petitioner must show prejudice in that the deficient performance by counsel consisted of errors that "were so serious as to deprive the defendant of a fair trial" whose result was reliable. *Id.* at 687. To establish such prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" is one "sufficient to undermine confidence in the outcome." *Id.* A petitioner is not entitled to post-conviction relief where the record establishes that it is "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

Singfield raised both of the ineffective assistance of counsel claims in the State Petition. As discussed above in relation to Claim 1, during Donna Claiborne's testimony, trial counsel asked her if she knew that Singfield had been convicted of second-degree murder. At the post-conviction hearing, Singfield's trial counsel testified that it was his strategy, given that he understood that the

conviction could likely be used in impeachment and that the second trial was a bench trial, to elicit this information up front to "take the sting out of things." Post-Conviction Hrg. Tr. at 7. He testified that if it had been a jury trial, his strategy would have been different; he would have filed a motion to exclude the evidence. Singfield's trial counsel also testified at the post-conviction hearing that he had prepared Claiborne for her testimony, and that he believed that the question had no impact on her testimony at trial. The Circuit Court, in its role as the post-conviction court, denied the claim based on the conclusion that although it was unclear whether the prior conviction would have been admissible under Maryland law, in part because of its age, trial counsel made a strategic decision that the defense, and not the prosecution, should introduce the unfavorable information about Singfield's prior conviction, and that Singfield had failed to show that the disclosure of that information contributed to the guilty verdicts. This Court finds that the Circuit Court's conclusion that Singfield failed to demonstrate deficient performance and prejudice is neither contrary to nor an unreasonable application of *Strickland*. Singfield has failed to overcome the presumption that his counsel's approach to minimizing the negative impact of his criminal history "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689. Even if an alternative strategy would have been to file a pretrial motion in *limine*, where the trial was a bench trial, the trial judge would have learned about the prior conviction either way, and trial counsel reasonably concluded that the trial judge would not be tainted by information about the prior conviction, even if inadmissible. For the same reason, Singfield cannot show that there is a reasonable probability that if his trial counsel had not asked about the prior conviction, and had instead filed a motion *in limine*, the trial judge would have reached a different verdict.

As for Claim 4, Singfield asserts that his trial counsel failed to investigate or interview six potential alibi witnesses but specifically references only Claiborne, Calvin Bell, and Brittany

Graham. At the post-conviction hearing, Singfield's trial counsel testified using contemporaneous notes from his file that he investigated the alibi witnesses of which Singfield made him aware. He testified that he spoke to Claiborne, who he called as a witness, and Bell, who he determined would not have been a helpful witness. He had no record or recollection that Singfield had identified Graham to him. Trial counsel also testified that he did not seek to call Jeffrey Eaddy as a witness because he spoke to Eaddy's attorney and understood that the attorney would not permit Eaddy to discuss the case with him. The Circuit Court found that trial counsel had testified credibly on this issue, and that he had contacted or attempted to contact the potential alibi witnesses identified to him, such that there was no ineffective assistance based on a failure to investigate or interview potential alibi witnesses.

This Court finds that the Circuit Court's conclusion that Singfield failed to demonstrate deficient performance and prejudice is neither contrary to nor an unreasonable application of *Strickland*, particularly where it credited trial counsel's testimony about his efforts to investigate the potential alibi witnesses. Notably, as to Graham, the only identified witness that trial counsel did not interview, Singfield has not asserted that she had any information beyond that to which she testified at the first trial, which resulted in a conviction, so he has not demonstrated that her testimony would create a reasonable probability that the outcome of the trial would have been different. The Court will therefore deny the Petition as to the ineffective assistance of counsel claims asserted in Claims 3 and 4.

## VIII. Motion to Suppress

In Claim 5, Singfield seeks habeas relief based on the denial of a hearing on a Motion to Suppress advanced prior to the second trial. Before the first trial, Singfield filed a Motion to Suppress his recorded statement to the police on the grounds that his waiver of his rights under

*Miranda v. Arizona*, 384 U.S. 436 (1966), was ineffective. The trial court denied the motion based on the finding that Singfield signed the necessary waiver forms, his statement was freely and voluntarily given, and he never invoked his right to silence or right to counsel.

After the remand for a new trial, Singfield's new trial counsel filed a Motion to Suppress relating to items seized pursuant to search warrants, an issue that was not litigated during the earlier pretrial proceedings. Singfield's counsel argued that he should be permitted to have a second hearing relating to suppression of evidence because the issue was separate from the one previously litigated, and it would be more efficient than to run the risk of reversal on appeal. The trial court denied the motion without a hearing on the grounds that the law of the case doctrine precluded the reopening of suppression issues, as the issue could have been asserted previously. Singfield challenged that ruling on his second direct appeal. The Appellate Court found that Singfield could have sought suppression of the evidence seized pursuant to the warrants prior to the first trial, and that under the Maryland Rule 4–252, as well as Maryland case law, the trial court then had discretion to refuse to conduct a second suppression hearing.

Respondent argues that Singfield's claim based on the failure to consider the second Motion to Suppress is non-cognizable in federal habeas review. A federal petition for a writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). For a claim of relief presented under § 2254 to be cognizable for review, the petitioner must assert a violation of federal law. *See Wilson v. Corcoran*, 562 U.S.1, 1 (2010) ("Federal courts may not issue writs of habeas corpus to state prisoners whose confinement does not violate federal law."); *Torrence v. Lewis*, 60 F.4th 209, 214 (4th Cir. 2023) (holding that a federal habeas petitioner could not "receive federal habeas relief solely for an error of state law, even if one exists"). Thus, to the extent that Singfield's claim is that the trial court's denial of a

second suppression hearing violated the Maryland Rules or any other aspect of Maryland law, it is a state law claim that is non-cognizable on federal habeas review and thus subject to dismissal.

To the extent that Singfield's claim could be construed as asserting that the denial of his Motion to Suppress violated the Fourth Amendment to the Constitution based on an unreasonable search or seizure, federal habeas relief is not available for an alleged Fourth Amendment violation when a petitioner had "an opportunity for full and fair litigation" of the Fourth Amendment claim in the state proceedings. *Stone v. Powell*, 428 U.S. 465, 494 (1976); *Boggs v. Bair*, 892 F.2d 1193, 1199–1200 (4th Cir. 1989); *Doleman v. Muncy*, 579 F.2d 1258, 1265 (4th Cir. 1978). The rationale for this rule is that where the purpose of excluding evidence obtained in violation of the Fourth Amendment is to deter misconduct by law enforcement officers, providing an additional avenue for the exclusion of evidence through federal habeas relief is unlikely to have any additional deterrent effect. *See Stone*, 428 U.S. at 491–93. As for what constitutes a full and fair opportunity to litigate a Fourth Amendment claim, the court must first "inquire as to whether or not the petitioner was afforded an *opportunity* to raise his Fourth Amendment claims under the then existing state practice" and, if such an opportunity was provided, need not inquire further "unless the prisoner alleges something to indicate that his opportunity for a full and fair litigation of his Fourth Amendment claim or claims was in some way impaired." *Doleman*, 579 F.2d at 1265.

Here, Singfield had a full and fair opportunity to seek suppression of the evidence seized pursuant to the warrants at issue. The Appellate Court concluded that his first trial counsel could have raised this issue prior to the first trial, thus establishing that he had a full and fair opportunity to litigate the Fourth Amendment issue. Although Singfield alleged in the State Petition that the basis to seek suppression of the evidence seized pursuant to the warrants did not arise until a discovery disclosure made after the first suppression hearing, that disclosure was made on June 2,

2015, prior to the first trial which occurred in July 2015, so even if suppression could not have been sought prior to the disclosure, Singfield has provided no basis upon which to conclude that his trial counsel could not have sought suppression in advance of the first trial. Thus, Singfield's Fourth Amendment challenge to the validity of the warrants is barred by *Stone*. *See Grimsley v. Dodson*, 696 F.2d 303, 304 (4th Cir. 1982) (stating that *Stone* "marked, for most practical purposes, the end of federal court reconsideration of Fourth Amendment claims by way of habeas corpus petitions where the petitioner had an opportunity to litigate those claims in state court").

Finally, the Court notes that in the State Petition, Singfield asserted the related claim that his trial counsel was ineffective in litigating the request for a second suppression hearing by failing to argue that a second hearing was justified by the June 2, 2015 discovery disclosures. His trial counsel testified at the post-conviction hearing that he filed the second Motion to Suppress in order to create an appealable issue for Singfield, but he did not believe that it was a winnable argument because Singfield's first trial counsel still could have sought a second suppression hearing after the discovery disclosure and before the first trial and thus had effectively waived it. The Circuit Court concluded that Singfield's trial counsel was not ineffective because there had been no showing that Singfield could have succeeded on the second Motion to Suppress.

The Circuit Court's ruling on this issue in relation to the State Petition was neither contrary to nor an unreasonable application of *Strickland.* The Circuit Court reasonably concluded that Singfield had not made a showing that the warrants lacked probable cause or that the searches could not be upheld under the good faith exception established in *United States v. Leon*, 468 U.S. 897 (1984), such that the prejudice requirement was not satisfied. In relation to the present Petition, Singfield has similarly made no such showing. Accordingly, whether Claim 5 is

construed as a Fourth Amendment claim or as a Sixth Amendment ineffective assistance of counsel claim, the Court finds that it lacks merit.

## IX. Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Because the accompanying Order is a final order adverse to the applicant, 28 U.S.C. § 2253(c)(1) requires issuance of a certificate of appealability before an appeal can proceed.

A certificate of appealability may issue if the prisoner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a district court rejects constitutional claims on the merits, a petitioner may satisfy the standard by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When a petition is denied on procedural grounds, the petitioner may meet the standard by showing that reasonable jurists "would find it debatable whether the petition states a valid claim of the denial of a constitutional right" and "whether the district court was correct in its procedural ruling." *Id.*

Upon review, the Court finds that Singfield has failed to satisfy either standard in relation to his claims. Therefore, a certificate of appealability will not be issued.

## CONCLUSION

For the foregoing reasons, Singfield's Petition for a Writ of Habeas Corpus will be DISMISSED and DENIED. The Court declines to issue a certificate of appealability. A separate Order shall be issued.

Date: September 30, 2026

THEODORE D. CHUANG
United States District Judge